[No. 66784-5. En Banc.]
Argued March 24, 1999. Decided August 5, 1999.
THE STATE OF WASHINGTON, *Respondent*, v. NICHOLAUS J. McDONALD, *Petitioner.*

*Thomas E. Doyle* and *Patricia A. Pethick*, for petitioner.
*H. Steward Menefee, Prosecuting Attorney*, and *Gerald R. Fuller, Deputy*, for respondent.

ALEXANDER, J. — The State of Washington charged Nicholaus J. McDonald in Grays Harbor County Superior Court with three counts of aggravated first degree murder. A jury found McDonald guilty of two counts of the lesser-

included offense of second degree murder, and acquitted him on the third count. Based on the verdict, the trial court sentenced McDonald to an exceptional sentence of 778 months. McDonald appealed, arguing that (1) his actions did not constitute the proximate cause of the second degree murder of one victim, (2) the trial court erred in instructing the jury regarding both principal and accomplice liability in a single jury instruction, and in refusing to admit evidence of the out-of-court statements of McDonald's alleged accomplice, and (3) he was denied effective assistance of counsel. The Court of Appeals affirmed the trial court. We then granted McDonald's petition for discretionary review. We affirm the convictions.

## FACTS

On August 11, 1995, after walking into a police station in Grants Pass, Oregon, 17-year-old Nicholaus McDonald implicated his 16-year-old boyfriend Brian Bassett (hereinafter Bassett) in the shooting deaths of Bassett's parents, Michael and Wendy Bassett. McDonald indicated to the Grants Pass police officers that the shootings took place at the Bassetts' home in McCleary, Washington, at approximately 12:30 A.M. that day. He said that Bassett, who had been "kicked out" of his parents' home, climbed up a ladder and then surreptitiously entered the home through a second-floor window. Verbatim Report of Proceedings (RP) at 1274. McDonald revealed that as he waited outside of the house he heard gunshots. Bassett, according to McDonald's statement to the Grants Pass police, thereafter came out and accompanied McDonald inside, allegedly telling him that "I had to finish his parents off." RP at 1766. McDonald also implicated himself in the drowning death of Bassett's five-year-old brother Austin. McDonald was returned to Washington and was thereafter charged in Grays Harbor County Superior Court with three counts of

aggravated first degree murder for the deaths of Wendy, Michael, and Austin Bassett.[1]

A police officer who had taken McDonald's statement in Grants Pass testified at trial and indicated that McDonald told him that upon entering the home with Bassett he found Bassett's parents lying dead with their child, Austin, crying and touching his parents in an apparent effort to rouse them. The officer went on to say that McDonald told him that Bassett filled a bathtub and told Austin, who was covered in his parents' blood, "that he had to take a bath." RP at 1277. The officer said that McDonald told him that "he then went into the bathroom and that Bassett was waiting just outside the door," and "that he feared Bassett would shoot him, so he held the boy under the water face down until he was drowned." RP at 1282.

McDonald testified at trial and admitted that he shot Michael once in the head with Bassett's gun, claiming that he did so only to relieve Michael's "suffering" after Bassett had already shot him. RP at 1860. "I felt that he was suffering," he testified, ". . . and I heard what sounded like air was—like, his lung was shot and air was going through the lung or through the hole." RP at 1860-61.

McDonald denied that he had shot Wendy Bassett, and, despite his earlier statements to the Grants Pass police, he also denied having drowned Austin Bassett. McDonald claimed that his earlier confession to Austin's murder was intended to conform to a "concoction that me and Brian had came to," RP at 1841, and now claimed that he had entered the bathroom to find that Bassett had already drowned Austin in the bathtub. Instead of assisting Bassett in this murder, McDonald asserted that "I gave him a dirty look." RP at 1795. McDonald admitted to driving off alone with the bodies of Austin and Michael and hiding them along a logging road. He also conceded that he helped Bassett hide Wendy's body in the Bassetts' pump house, and

---

[1]Bassett was also charged with three counts of aggravated first degree murder and was convicted. In an unpublished opinion, the Court of Appeals affirmed Bassett's convictions. *State v. Bassett*, No. 20551-3-II (Wash. Ct. App. Feb. 26, 1999).

that he cleaned the Bassetts' home after the murders in order to conceal evidence of the killings.

A forensic pathologist testified for the State. His testimony revealed that Michael Bassett had been shot five times, and that either of two gunshot wounds to Michael's head, including the one that McDonald admitted to, would have been fatal. Moreover, of the other three gunshot wounds, one—a gunshot wound to the heart—would have been fatal. Yet another wound "may have been fatal." RP at 1221. According to the pathologist, the order in which these injuries occurred could not be determined.

The jury acquitted McDonald of the murder of Wendy Bassett, and found him guilty of the second degree murders of Austin and Michael Bassett. McDonald appealed to the Court of Appeals, Division Two, which unanimously affirmed the trial court in a partially published opinion. *See State v. McDonald*, 90 Wn. App. 604, 953 P.2d 470, *review granted*, 136 Wn.2d 1019, 969 P.2d 1064 (1998). We granted McDonald's petition for review.

## ANALYSIS

1. McDonald's contention that his act of shooting Michael Bassett, after Michael had been mortally wounded, was not a proximate cause of Michael's death.

McDonald would have us examine the question of whether his act of shooting Michael Bassett constituted, as a matter of law, a proximate cause of Michael's death. Although McDonald concedes that Michael was alive at the time he shot him, he contends that his act was not the proximate cause of Michael's death because Michael's death was already imminent due to gunshot injuries inflicted by Bassett. In support of this contention, he points to the testimony of the forensic pathologist, who indicated that before McDonald fired a gun at Michael's head, Michael had already sustained two, and possibly three, gunshot wounds—each of which would have been fatal. The question posed by McDonald is whether McDonald's conduct in shooting Michael was a proximate cause of Michael's death.

The trial court's instruction on proximate cause, instruction 18, provided as follows:

> To constitute murder, there must be a causal connection between the death of a human being and the criminal conduct of a defendant *or* a person to whom a defendant acts as an accomplice so that the act done was *a* proximate cause of the resulting death.
>
> The term 'proximate cause' means a cause which, in a direct sequence, unbroken by any new independent cause, produces the death, and without which the death would not have happened.
>
> *There may be more than one proximate cause.*
>
> If you are satisfied beyond a reasonable doubt that the acts of the defendant *or* a person to whom he acted as an accomplice, were *a* proximate cause of the death of the deceased, *it is not a defense that the conduct of another may also have been a proximate cause of the death.*

Clerk's Papers (CP) at 30 (emphasis added). With the exception of the reference to "accomplice," the first three paragraphs mirror Washington Pattern Instructions—Criminal (WPIC) 25.02. The last paragraph is taken verbatim from WPIC 25.03. *See* 11 WASHINGTON PRACTICE: WPIC §§ 25.02-03, at 276-80 (2d ed. 1994). As the Court of Appeals correctly observed, under this instruction the jury could find "either that McDonald's gunshot was one of multiple proximate causes of Michael's death or that McDonald acted as an accomplice to Bassett, whose gunshots were a proximate cause of Michael's death." *McDonald*, 90 Wn. App. at 610.

█ The State avers that we need not decide the question posed by McDonald because there is substantial evidence from which the jury could have convicted McDonald as an accomplice of Bassett. That being the case, it argues that we need not address the question of principal liability for McDonald. For reasons we set forth hereafter, we agree with the State that there is substantial evidence in the record that McDonald acted as Bassett's accomplice. We also

agree that, because there is substantial evidence of accomplice liability, under the trial court's instruction we need not examine whether the evidence supports principal liability as well. That is so because principal and accomplice liability are not alternative means of committing a single offense. Accordingly, McDonald's proximate cause argument is irrelevant, for even if he were correct in asserting that his act of shooting Michael was not the proximate cause of his death, Bassett's act, to which McDonald was an accomplice, would be the proximate cause of Michael's death.

We are not unmindful of the fact that where the trial court instructs the jury that there are alternative means of committing the charged criminal act, and does not require a unanimous determination of which alternative is used, we have required substantial evidence of each alternative. *See State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984) (citing *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976)), *modified on other grounds by State v. Kitchen*, 110 Wn.2d 403, 405-06, 756 P.2d 105 (1988). Consistent with that view, we have noted that "if the evidence is *insufficient* to present a jury question as to whether the defendant committed the crime by any one of the means submitted to the jury, the conviction will not be affirmed." *State v. Ortega-Martinez*, 124 Wn.2d 702, 708, 881 P.2d 231 (1994) (citing *State v. Whitney*, 108 Wn.2d 506, 739 P.2d 1150 (1987); *State v. Franco*, 96 Wn.2d 816, 639 P.2d 1320 (1982); *State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980); *State v. Simon*, 64 Wn. App. 948, 831 P.2d 139 (1991), *aff'd in part*, 120 Wn.2d 196, 840 P.2d 172 (1992)).

■■ These cases have turned, however, upon alternative means of *principal* liability: for example, premeditated murder and felony murder as alternative means described in a jury instruction of committing first degree murder. *See State v. Fortune*, 128 Wn.2d 464, 909 P.2d 930 (1996). In contrast, we have never before held that accomplice liability qualifies as an alternative means of committing a single offense also presented on the basis of principal liability. Were

we to have done so, we would contradict our holdings concerning the nature of accomplice liability. In this regard, we have made clear the emptiness of any distinction between principal and accomplice liability:

> The legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as a principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant. *The elements of the crime remain the same.*

*State v. Carothers*, 84 Wn.2d 256, 264, 525 P.2d 731 (1974) (emphasis added), *disapproved on other grounds by State v. Harris*, 102 Wn.2d 148, 153-54, 685 P.2d 584 (1984). Accordingly, "a verdict may be sustained upon evidence that the defendant participated . . . as an aider or abettor, even though he was not expressly accused of aiding and abetting and even though he was the only person charged in the information." *Carothers*, 84 Wn.2d at 260 (citing *State v. Frazier*, 76 Wn.2d 373, 456 P.2d 352 (1969); *State v. Brown*, 75 Wn.2d 611, 452 P.2d 958 (1969)). Here the jurors need not have decided whether it was Bassett or McDonald who actually killed Michael "so long as both participated in the crime." *State v. Hoffman*, 116 Wn.2d 51, 105, 804 P.2d 577 (1991).

The only authority we can find that supports the proposition that substantial evidence must support finding McDonald guilty as both a principal and an accomplice is an opinion from Division One of the Court of Appeals. There the court reversed a conviction, and remanded for a new trial, on the basis that there was not substantial evidence of accomplice liability—leaving the court unable to

> determine whether the jury based its verdict on constructive possession or accomplice liability because instruction 8, the "to-convict" instruction, allowed the jury to convict on either of these theories. Where, as here, the jury is presented with alternative means of committing a crime, jury unanimity is not required [as to which means upon which to convict] as long as there is substantial evidence of both alternatives.

*State v. Amezola*, 49 Wn. App. 78, 90, 741 P.2d 1024 (1987) (footnotes omitted) (citing *State v. Stephens*, 93 Wn.2d 186, 190, 607 P.2d 304 (1980); *Arndt*, 87 Wn.2d at 376-77; *Petrich*, 101 Wn.2d at 569).

That *Amezola* was a misreading of our alternative means cases is buttressed by the fact that it was later contradicted by another Division One panel, which wrote that "[s]trictly speaking, accomplice liability, formerly referred to as aiding and abetting, *does not* constitute an alternative means of committing a crime." *State v. Munden*, 81 Wn. App. 192, 197, 913 P.2d 421 (1996) (emphasis added). *Munden* involved a defendant who was convicted of second degree burglary as an accomplice, despite the fact that "the State's evidence tended to show that he and two others accomplished the burglary as principals." *Munden*, 81 Wn. App. at 193. Because the evidence did not *exclude* the possibility that he had acted as an accomplice, the court noted that accomplice liability was supported and "to say that accomplice liability is not an alternative means does not alter our analysis in the present case." *Munden*, 81 Wn. App. at 197.

While *Munden* hinted at the right approach, we would take a logical step further and hold that because the evidence in this case clearly supports a finding of *accomplice* liability, we need not engage in the empty exercise of reaching McDonald's *principal* liability argument or the Court of Appeals' resolution of it. It is enough to note that "[a]ccomplice liability represents a legislative decision that one who participates in a crime is *guilty as a principal*, regardless of the degree of the participation." *Hoffman*, 116 Wn.2d at 104 (emphasis added) (citing *State v. Randle*, 47 Wn. App. 232, 237, 734 P.2d 51 (1987), *review denied*, 110 Wn.2d 1008 (1988)).

■ McDonald, not content to simply eat his cake, would have it too by arguing that he could not have even been convicted as an accomplice: "In the context of multiple proximate causes, accomplice liability only lies if it can be said that the accomplice's act was the proximate cause of

the principal's act which, in turn, was the proximate cause of death." Br. of Appellant at 28. In other words, McDonald asserts that the accomplice must *cause* the principal to act. This contention is erroneous. We have previously defined accomplice liability as follows: "A person is legally accountable for the conduct of another person if he is an accomplice to that person in the commission of the crime." *State v. Davis*, 101 Wn.2d 654, 657, 682 P.2d 883 (1984). One acts as an accomplice if "[w]ith knowledge that it will promote or facilitate the commission of the crime, he . . . solicits, commands, encourages, or requests such other person to commit it; or . . . *aids or agrees to aid such other person in planning or committing it.*" RCW 9A.08.020(3)(a)(ii) (emphasis added). This language is included in the trial court's instruction 11.[2]

Even if the jury concluded that McDonald did not act as a principal when he shot Michael in the head, it could have found that McDonald *aided* Bassett in the commission of a crime. McDonald, by his own admission, shot Michael Bassett in the head while he was still alive. Surely a more compelling example of participation in a crime could not be found. We have written that " 'it matters not that some jurors may have believed that the petitioner fired the gun, while others may have believed that his only role was in aiding and abetting [the other participant], so long as all twelve agreed that he did participate.' " *Hoffman*, 116 Wn.2d at 105 (alteration in original) (quoting *Carothers*, 84 Wn.2d at 265). Clearly, that standard was met in this case.

On the other hand, if McDonald were correct in his arguments concerning both principal and accomplice liability we would necessarily conclude that both he *and* Bassett

---

[2]Accomplice liability is also expressly incorporated into instructions 5-7, which establish the elements necessary to convict McDonald of the murders in the first degree of Michael, Wendy, and Austin, and in the lesser crime instructions, 14-17, for the elements necessary to convict McDonald of murder in the second degree. McDonald did not challenge these instructions. " '[T]he jury is presumed to read the court's instructions as a *whole*, in light of *all other* instructions. The jury is also to presume each instruction has meaning.' " *State v. Studd*, 137 Wn.2d 533, 549, 973 P.2d 1049 (1999) (alteration in original) (quoting *State v. Hutchinson*, 135 Wn.2d 863, 885, 959 P.2d 1061 (1998), *cert. denied*, 525 U.S. 1157 (1999)).

were blameless in McDonald's death. Under the reasoning of McDonald's counterintuitive defense theory Bassett would also escape punishment for his father's death; thus, no one would bear responsibility. Yet instruction 18, as noted above, states that *"it is not a defense that the conduct of another may also have been a proximate cause of the death."* CP at 30 (emphasis added). We agree with the Court of Appeals that "[i]t would be absurd to absolve multiple assassins of guilt, simply because death cannot be attributed to a single individual's actions." *McDonald*, 90 Wn. App. at 616.

2. Alleged errors by the trial court.

A. Did the trial court err in incorporating accomplice liability into its proximate cause instruction?

█ The foregoing logic guides us in dismissing McDonald's argument, made for the first time on appeal, that instruction 18 is erroneous because it "does not conform to WPIC 25.02 and 25.03, and improperly incorporates accomplice liability into the completely separate legal concept of proximate cause, thus substituting a method of proof for the satisfaction of an element of the offense, i.e., proximate cause." Br. of Appellant at 32-33. Under Rule 2.5(a) of the Rules of Appellate Procedure (RAP), appellate courts will generally not consider issues raised for the first time on appeal. "However, a claim of error may be raised for the first time on appeal if it is a 'manifest error affecting a constitutional right.' " *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995) (quoting RAP 2.5(a)(3) (citing *State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988); *State v. Lynn*, 67 Wn. App. 339, 342, 835 P.2d 251 (1992))). The burden, though, is upon the defendant to make the required showing. "The defendant must identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights; it is this showing of *actual prejudice* that makes the error 'manifest,' allowing appellate review." *McFarland*, 127 Wn.2d at 333 (emphasis added) (citing *Scott*, 110 Wn.2d at 688; *Lynn*, 67 Wn. App. at 346).

McDonald does not meet the threshold requirement of identifying a constitutional error. After all, he cannot argue that *neither* he nor Bassett was the proximate cause of Michael Bassett's death, and instruction 18 read that "[t]o constitute murder, there must be a causal connection between the death of a human being and the criminal conduct of a defendant *or* a person to whom a defendant acts as an accomplice so that the act done was a proximate cause of the resulting death." CP at 30 (emphasis added). This is a correct statement of the law. Thus, under instruction 18, the result would be the same even if the jury believed that only Bassett's gunshots were a proximate cause of Michael's death because McDonald acted in conjunction with Bassett and would share the same liability as his accomplice. *See Hoffman*, 116 Wn.2d at 105 ("The jury in this case need not have decided whether it was Hoffman or McGinnis who actually shot and killed Officer Millard so long as both participated in the crime."). Accordingly, it cannot be argued that proximate cause was unproven in this case, for it is not as though the jury instruction allowed the jury to believe that something beyond the acts of the two participants, Bassett and McDonald, constituted the proximate cause of Michael's death. McDonald's claim of constitutional error is unavailing.

Even more easily dismissed is McDonald's claim that because he

> was acquitted of the death of Wendy Bassett, a reasonable inference can be drawn that the jury did not find him to be an accomplice of Brian Bassett regarding the death of either Wendy or Michael Bassett. As a result, McDonald's action cannot be argued to be the proximate cause of Michael Bassett's death, and his conviction for this crime must be reversed.

Pet. for Review at 13-14. This is mere speculation, however. Perhaps the jury just accepted his explanation that he did not know that Bassett planned to kill his parents, but he did come into the house after Wendy had already been mortally wounded in order to assist Bassett in killing Michael.

B. Did the trial court commit reversible error in refusing
 to admit evidence of out-of-court statements that Bas-
 sett allegedly made to a fellow jail inmate?

 McDonald next argues that he was denied the op-
portunity to present admissible evidence in his defense
when the trial judge refused to admit evidence of out-of-
court statements that Bassett had allegedly made to an-
other. At a pretrial CrR 3.5 hearing, Ernie Lunsford, Jr.
testified that following the murders, while he was a fellow
inmate with Bassett in the Grays Harbor County jail, Bas-
sett confided that *he,* not McDonald, had killed Austin Bas-
sett. In determining whether evidence of Bassett's state-
ments to Lunsford was reliable and admissible under ER
804(b)(3), the trial judge ruled that these statements were
untrustworthy and inadmissible at trial: "[T]here are no
real corroborating circumstances that would clearly in-
dicate trustworthiness of the statements." RP at 770. We
review a trial court's evidentiary rulings under the abuse
of discretion standard. *See State v. Myers,* 133 Wn.2d 26,
34, 941 P.2d 1102 (1997) (citing *State v. Powell,* 126 Wn.2d
244, 258, 893 P.2d 615 (1995)).

 ER 804(b)(3) provides for a hearsay exception allow-
ing the admission of a statement against interest where
the declarant is unavailable (as Bassett, himself a murder
defendant in a separate proceeding, certainly was):

> A statement which was at the time of its making so far con-
> trary to the declarant's pecuniary or proprietary interest, or so
> far tended to subject the declarant to civil or criminal liability,
> or to render invalid a claim by the declarant against another,
> that a reasonable person in the declarant's position would not
> have made the statement unless the person believed it to be
> true. . . . [A] statement tending to expose the declarant to
> criminal liability [and offered to exculpate the accused] is not
> admissible unless corroborating circumstances *clearly* indicate
> the trustworthiness of the statement.

(Emphasis added.) *See also State v. St. Pierre,* 111 Wn.2d
105, 117, 759 P.2d 383 (1988) (citing *State v. Ng,* 104 Wn.2d

763, 772, 713 P.2d 63 (1985)). If Bassett confessed to Austin's murder, that statement would certainly be against his penal interest. Nine factors are then applied in determining "whether the reliability required of inculpatory statements under ER 804(b)(3) and the confrontation clause is satisfied." *State v. Whelchel*, 115 Wn.2d 708, 722, 801 P.2d 948 (1990) (citations omitted). These factors are as follows:

1. Was there an apparent motive for declarant to lie?

2. What was the declarant's general character?

3. Did more than one witness hear declarant's statement?

4. Was the statement made spontaneously?

5. Did the timing of the statements and the relationship between declarant and witness suggest trustworthiness?

6. Does the statement contain an express assertion of past facts?

7. Did the declarant have personal knowledge of the identity and role of the crime's other participants?

8. Was the declarant's statement based upon faulty recollection?

9. Was the statement made under circumstances that provide reason to believe the declarant misrepresented defendant's involvement in the crime?

*See Whelchel*, 115 Wn.2d at 722-25; *State v. Mitchell*, 117 Wn.2d 521, 529, 817 P.2d 398 (1991), *overruled on other grounds by State v. Dent*, 123 Wn.2d 467, 485, 869 P.2d 392 (1994).

McDonald does not contest the fact that Bassett's "character suggests just the opposite" of trustworthiness (factor two). *Whelchel*, 115 Wn.2d at 722. He could hardly do so given both Bassett's confession to law enforcement that he participated in the murders and the nature of the crimes charged. Nor does McDonald contest the fact that only one person, Lunsford, heard the alleged statement

(factor three). Obviously the statement "contained express assertions of past fact" (factor six). *Whelchel*, 115 Wn.2d at 724. All of these factors weigh against trustworthiness. Moreover, Bassett "had an apparent motive to lie" (factor one). *Whelchel*, 115 Wn.2d at 722. He allegedly told Lunsford that "he loved Nick [McDonald]," and thus may have wanted to spare McDonald from prison. RP at 725. Similar to factor one is factor nine. We have McDonald's own testimony that he and Bassett made up a story to explain their crimes,[3] a story which evolved during their questioning by police.[4] Thus, there is every reason to think that Bassett's alleged confession to Lunsford was just another lie in a series of fabrications. The one consistency in Lunsford's contradictory accounting was that at one point Bassett implicated himself, and at another point McDonald, in Austin's death. Thus, Bassett would have obviously lied in one of those two statements, casting further disrepute upon the trustworthiness of the "confession." As for the question of "whether the statements were made spontaneously" (factor four), there was not "any kind of unsolicited narrative on the part of the declarant." *Whelchel*, 115 Wn.2d at 723. Instead, Lunsford admits that he asked Bassett what happened, and he would not tell him, and then Lunsford asked: "Well, can I guess? And I started asking him questions and led on from there, and he said he killed his mom, his dad and his brother." RP at 723. However, Lunsford subsequently testified that during that initial response to his questioning Bassett had said that "Nick drowned him [Austin]." RP at 739. The trial judge could

---

[3]As McDonald testified:

"The idea was that he wanted to go to the crazy ward and he wanted me to take—oh, basically what he said—or—not what he said but the idea, the idea was that, um, that he held the gun to my head and made me drowned his brother. After killing his parents, he held the gun to my head and made me drive out in the woods and dump the bodies off, and that I was scared for my life, and that he was crazy." RP at 1826.

[4]To quote from an exchange between McDonald and his attorney:

Q. "When you heard what Brian had said, what did you think?

A. "I thought he messed the whole thing up really bad and that I had to make my story go along with his, so I changed it." RP at 1843.

have rightly concluded that Lunsford's leading questioning, after Bassett had indicated he did not want to discuss the matter, defeated spontaneity.[5] As for the fifth factor, Bassett "had both opportunity and motive to reassess the events surrounding the murder." *Whelchel*, 115 Wn.2d at 723. While Lunsford and McDonald were "friends," Lunsford had no close friendship with Bassett. RP at 726. Finally, the only factors weighing in favor of trustworthiness were that Bassett had personal knowledge of the murders (factor seven) and "the possibility of the declarant's recollection being faulty is remote" (factor eight). *Whelchel*, 115 Wn.2d at 724. All in all, it would appear that the trial judge rightly concluded that "the circumstances surrounding the statement do not lend great confidence in its trustworthiness." *St. Pierre*, 111 Wn.2d at 118.

"Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971) (citing *MacKay v. MacKay*, 55 Wn.2d 344, 347 P.2d 1062 (1959); *State ex rel. Nielsen v. Superior Court*, 7 Wn.2d 562, 110 P.2d 645, 115 P.2d 142 (1941)). In overview, no abuse of discretion by the trial court in its evidentiary ruling excluding Lunsford's testimony has been shown that would allow this court to reverse McDonald's conviction. *See Myers*, 133 Wn.2d at 34.

3. Did McDonald receive ineffective assistance of counsel?

 McDonald's final argument is that he was prejudiced by ineffective assistance of trial counsel. We strongly presume that trial counsel's representation was effective. *See McFarland*, 127 Wn.2d at 335. To establish ineffective assistance of counsel, McDonald must demonstrate two

---

[5]*But see Mitchell*, 117 Wn.2d at 531 (statement found to be spontaneous where defendant, *prior* to his arrest and confinement, gave it in response to a question outside of " 'coercive atmosphere of official interrogation' ").

things. *See, e.g., State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (applying test from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh'g denied*, 467 U.S. 1267 (1984)). McDonald must first show that his "counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances." *McFarland*, 127 Wn.2d at 334-35 (citing *Thomas*, 109 Wn.2d at 225-26). However, "[d]eficient performance is *not* shown by matters that go to trial strategy or tactics." *State v. Hendrickson*, 129 Wn.2d 61, 77-78, 917 P.2d 563 (1996) (emphasis added) (citing *State v. Garrett*, 124 Wn.2d 504, 520, 881 P.2d 185 (1994)).

McDonald faults his trial attorney for not objecting to instruction 18, which was, as we have discussed, not an incorrect statement of the law. He also faults his attorney for his failure to introduce testimony from a corrections officer at the Jackson County juvenile facility, where Bassett and McDonald were initially held in Oregon, that he overheard Bassett mumbling to himself incriminating words about Austin's death. The officer, Frank Heflin, testified during a CrR 3.5 hearing that "I heard him say, I killed—I can't believe I killed my mother and father and dah-dah-dah-dah-dah brother dah-dah-dah, and he stopped at that point." RP at 230. Nothing about McDonald was overheard. On cross-examination the officer said that the words sounded like he "killed his parents and brother. I'm not sure. There was—like I said, there was mumbling in between 'mother' and 'brother.' I'm not sure 'brother' was involved together with the killing." RP at 234. McDonald asserts that this testimony would have corroborated Bassett's alleged statements to Lunsford. Because it is unclear that Bassett actually mumbled that he killed Austin, it is unlikely that this evidence would have served a corroborative purpose—or otherwise supported McDonald's defense that he did not kill Austin. McDonald's trial counsel could quite reasonably have decided that presenting this witness's testimony about Bassett's incoherent mumbling would not advance McDonald's defense.

Having concluded that the performance of McDonald's trial counsel was not deficient, we need not reach the second part of the test, in which McDonald would have had to establish that "defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *McFarland*, 127 Wn.2d at 335 (citing *Thomas*, 109 Wn.2d at 225-26).

## CONCLUSION

In conclusion, it is uncontroverted that Nicholaus McDonald shot Michael Bassett in the head as Michael lay dying of the gunshot wounds inflicted by his son, Brian Bassett. The trial court's instruction to the jury allowing it to convict McDonald of Michael's death as either a principal or as Bassett's accomplice was not erroneous, and substantial evidence supported accomplice liability. We reject McDonald's arguments that an out-of-court statement should have been admitted and that he was denied effective assistance of counsel. We affirm the Court of Appeals' decision upholding McDonald's convictions for the second degree murders of Austin and Michael Bassett.

GUY, C.J., and DURHAM, SMITH, JOHNSON, MADSEN, TALMADGE, SANDERS, and IRELAND, JJ., concur.